UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
GREG KENDAL SMITH,
dba G 13 Land Co., Inc.,
dba G13 Angus Ranch, Inc.
dba Leonard Goff Ranches, Inc.,
    Debtor.                                              No. 12-10-11752 SL

**MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR STAY RELIEF**

American Bank of Commerce ("Bank") filed its Motion for Relief from Stay to Resume State Court Turnover Proceeding Regarding Pledged Stock (doc 57). Debtor Greg Kendal Smith filed Debtor's Objection to American Bank of Commerce's Motion for Relief from Stay to Resume State Court Turnover Proceeding Regarding Pledged Stock (doc 64), and the Motion and Objection came on for a final hearing on October 20, 2010. Having considered the papers, the evidence, the presentations of counsel and the post-trial briefs, the Court grants the Motion.[1]

**Background**

Debtor claims an agistor's lien, pursuant to NMSA 1978 §48-3-7, on certain cattle owned by G13 Angus Ranch, Inc. ("G13"). He asserts that the claimed lien is an interest in the cattle that is property of the estate and therefore protected by the automatic stay. He therefore asserts that the Bank may not continue to pursue its turnover action against the cattle in the

---

[1] Creditor Buna Jean Glenn Estate filed a joinder in the Motion. Doc 65. Creditor did not participate in the final hearing, and given the disposition of the Motion, the Court need not rule on the propriety or effect of the joinder.

99th District Court of Lubbock County, Texas ("State District Court").[2]

Contrary to what might be suggested by the style of this case, G13 is a separate entity, a Texas corporation (Real Estate Lien Note, in Proof of Claim no. 8-1, Ex. 1, Ex. O)[3] whose president and sole shareholder is Debtor. G13 executed a note, mortgage and other security documents to Bank on September 16, 2005, for a loan of $598,750 at 9.5% interest rate. G13 executed a second note, mortgage and security documents on October 24, 2006 for an additional loan of $45,000 at 11.25% interest rate. And it executed a third note on October 19, 2005 in the amount of $46,761.44 at a 9% interest rate (to purchase a 2006 Ford pick up truck), secured by a lien on the cattle.[4] As of the date of the filing of Debtor's petition, G13 owed the Bank $715,008.88,

---

[2] Given that "turnover" is a bankruptcy term of art, e.g., §542 Turnover of property to the estate and §543 Turnover of property by a custodian, this memorandum opinion will use the term "roundup" to describe the State District Court's turnover orders.

[3] At the beginning of the final hearing, the parties stipulated to the admissibility of all the exhibits. The Bank's exhibits were numbered, Debtor's were lettered. There was some duplication in the exhibits. This memorandum opinion uses the abbreviation "Ex." to identify a trial exhibit, and the word "Exhibit" to identify attachments to motions and other papers filed with the Court, such as the Chapter 12 Plan.

[4] The documentation for all these loans and security arrangements are attached to the Banks' proof of claim. These financial arrangements are also summarized in paragraph 2.3 of the Debtor's First Amended Chapter 12 Plan of Reorganization dated August 19, 2010. Doc 41.

comprised of principle, interest, attorney fees and costs. Proof of Claim no. 8-1.

The Bank timely perfected its interests in the collateral, which is comprised of two parcels of land in Roosevelt County, New Mexico, comprised respectively of 2860 acres of ranch and farm land together with an adjoining state land lease (Tract 1) and 1280 acres of ranch land (Tract 2), the purebred Black Angus cattle herd, and various items of personal property such as a Chevy S10 pick-up truck, a cattle hauling trailer, etc.

With G13 in default on repaying its loans, the Bank in 2009 initiated an action in the State District Court (No. 2009-548,252) to obtain the surrender to the Bank of the cattle and of various items of personal property for liquidation and payment on the notes. On November 9, 2009, the State District Court entered judgment for the Bank. However, that collection effort was interrupted by the filing by G13 of a chapter 12 case in the United States Bankruptcy Court for the Northern District of Texas Lubbock Division, No. 09-50530-rlj12. The G13 chapter 12 case was dismissed on April 27, 2010 (though not before the issuance of a State Court Order reiterating its November 9, 2009 judgment and ordering a roundup of the herd – <u>see</u> Exhibit D attached to Motion), and the Bank resumed its efforts in the State District Court. On September 2, 2010, the State District Court issued its Order Granting Permanent Injunction and Granting Turnover Relief

(Ex. 2), whereby it again ordered G13 to assemble the cattle in one location and turn them over to the Bank.

In the meantime, however, Debtor had filed his own chapter 12 case in this Court on April 8, 2010, and appears to have filed a Notice of Automatic Stay with the State District Court on the same day. Thus, on September 14, 2010, Debtor filed his Motion to Vacate Order Granting Permanent Injunction and Granting Turnover Relief (Ex. 3), asserting that the issuance of the September 2 injunction and roundup order violated the automatic stay. Shortly thereafter the State District Court directed the parties to this Court for a determination of the stay issue.

The Bank's Motion asked for a ruling that the stay did not apply to property (the cattle) that did not belong to Debtor but was merely encumbered by Debtor's lien interest, or if the stay does apply in those circumstances that Debtor has no "lienhold" interest in the property, or if the stay does apply and Debtor has established an interest in the property, then the stay should be modified pursuant to §362(d)(2). Debtor's response denied each of the alternatives, and included an assertion that the cattle were necessary for the chapter 12 reorganization and therefore should not be sold (at least right now).[5] At the

---

[5] The response also asked for a §506(c) surcharge on the cattle representing the alleged value that went into preserving the collateral. The parties agreed that that issue could be addressed later.

preliminary hearing on the Motion, the Court established that the Bank might also seek relief under §362(d)(1).[6]  Doc 66 (Order Arising Out of Final Pretrial Conference).

At the outset of the trial the parties purported to stipulate to the amount of the debt ($715,008.88 as of the petition date), the value of the cattle (between $93,000 and $125,000), the senior position of the Bank's liens, and the amount claimed for the agistor's lien (approximately $31,960, as recited on pages 1-2 of the Objection, but ultimately about $40,000 – see Ex. Q).[7]  The Bank then cited to the evidence for the amount of its debt – approximately $715,000 of secured debt, its security documents, the value of the cattle (Ex. 11 and Ex. F: Livestock Inspection Report dated January 4, 2010, stating a

---

[6] Section 362(d)(1) and (2) provide as follows:
On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
(2) with respect to a stay of an act against property under subsection (a) of this section, if –
   (A) the debtor does not have an equity in such property; and
   (B) such property is not necessary to an effective reorganization;....

[7] Nevertheless the parties ended up contesting the value of the cattle and the amount secured by the agistor's lien.  The parties do agree that the Bank's lien position in the cattle is senior to any lien held by the Debtor/estate.

sale barn price of $93,250, though the Bank stated it was not arguing that the value was $93,000 versus $125,000), and the value of the real estate as set out in Debtor's Schedule A of $627,500. The Bank then rested.

Debtor moved for a denial of the Motion upon the Bank's resting. In the course of the argument, the Bank conceded that its claim was oversecured. The effect was to preclude relief under §362(d)(2). However, the Court refused to deny the Motion because the Bank still had its §362(d)(1) claim.

Debtor then testified at length, in relevant part as follows: He has been caring for this Black Angus herd for about 25 years, including managing their breeding and selling them as breeding stock by private treaty or, at one time, in some auctions at the ranch near Elida, New Mexico. He has continued to care for the cattle during his chapter 12 case. Were the Bank to repossess the herd, it would sell them merely as commercial cattle (beef cows), rather than breeding cattle, realizing thereby only 1/4 to 1/5 of their value. The Livestock Inspection Report represents the 1/4 to 1/5 value, and is not his number. Additionally, the Livestock Inspection Report, dated January 4, 2010, does not take into account that the breeding cows produced approximately 65 calves, and that the approximately 70 cows and the 30 heifers have all been artificially inseminated so that next spring there will be 100 cows set to calve next spring.

Thus the herd is currently worth about $300,000[8], and will increase in value next spring when the calves have dropped.

He also testified that Ex. Q represents the total agistor bill, including some veterinary bills, grass, assuring the cattle have water, getting the cattle inseminated when they are in heat, etc. Ex. Q totals $40,500.

Exs. C and D address the land values which also secure repayment of what is owed to the Bank. Debtor's initial Schedule A showed no real estate (doc 10), but was amended (or, more accurately, supplemented) after real estate from two related entities was transferred into the estate postpetition. Ex. C is the amended Schedule A, filed August 12, 2010 (doc 34), and it shows the real estate (Tracts 1 and 2) having a total value of $627,500. Ex. D is a document setting out a range of values for the ranch and farmland and improvements prepared by Debtor's real estate agent Charles Bennett, dated April 20, 2010, and addressed to Debtor's chapter 12 counsel. The high estimate of value is $1,411,000 and the low estimate is $627,500, with the "projected" value being $827,500. Debtor said he chose the "middle" value for the purposes of his schedules[9], but he would actually sell

---

[8] Toward the end of his testimony, Debtor estimated the value of the herd at $225,000 to $250,000.

[9] The term "middle" in the testimony could be confusing. Reading left to right, Ex. D sets out the high estimate ($1,114,000), the low estimate ($627,500) and the projected
(continued...)

Page 7 of 19

Case 10-11752-t12    Doc 81    Filed 11/01/10    Entered 11/01/10 16:13:31 Page 7 of 19

the real estate for the higher values, which he could get because of the superior location of the land along the highway (a factor, however, presumably taken into account in Mr. Bennett's evaluation) and because this has been a good year for rain. On cross examination he also attributed the increased value to the improving economy and rising land prices. And he pointed out that when G13 filed its own chapter 12 case earlier, he had estimated the value at $1,200,000. (Ex. E – Schedule A, filed December 9, 2009 in the G13 case.)[10] He ultimately stated that the land would now be worth about $1,000,000. This is a figure at variance from the $627,500 value the Debtor asserted in the Objection at 3 (doc 64), filed only a week before the trial.

---

[9](...continued) estimate ($827,500). So literally the "middle" [of the page] estimate is the low estimate, and is the one Debtor used for his August 12, 2010 schedule A in this case.

[10] The odyssey of the real estate is a still somewhat unclear to the Court, although the precise chain of fee ownership is not necessary to decide the Motion, given that the Bank has had recorded mortgages on all the real estate at all material times. Ex. E shows G13 owning the real estate when the G13 chapter 12 case was pending at least as of December 9, 2009. Ex. D (the Bennett estimate), dated April 20, 2010, shows Tract 1 owned by Leonard Goff Ranches, Inc. and Tract 2 owned by G13 Land Company, Inc. (not to be confused with G13 Angus Ranch, Inc.). Both Leonard Goff Ranches, Inc. and G13 Land Company, Inc. are also controlled by Debtor. Exhibits A and B attached to Schedule A are copies of the quitclaim deeds transferring Tracts 1 and 2 respectively from Leonard Goff Ranches, Inc. and G13 Land Company, Inc. to Debtor on May 17, 2010, 39 days after Debtor had filed this chapter 12 case.

And he also testified about the values of the pledged farm equipment set out in Exhibit G (G13's Schedule B/33, which he signed as G13's president), showing a 26" [sic] Eby trailer at $20,000, a Hamby Plow at $1,000, and a 1994 Chevy S10 pickup, a Tye Wheat Drill, a Hamby Sweep Plow, a Miller Disc Plow, and a 24 foot Rufneck Aluminum Cattle Trailer, all of "unknown" value. Debtor stated the trailer might be worth $50,000 if picked up by the Bank and sold (though he provided no explanation for why the Bank would possess and employ such marketing prowess for a stock trailer at the same time that, according to Debtor, it is about to vastly undersell the stock), and the remainder of the property might total $40,000.

In this case the CM file shows relatively little value in personal property in Schedule B that is available for liquidation: approximately $4,000 in business equipment (B/29), and no farm equipment (B/33). Doc 10, filed April 22, 2010.[11] And Schedule D does not list the Bank as a creditor holding a secured claim.

---

[11] On August 12, Debtor amended Schedules A, B, D, E, and F. Doc 37. The attachment constituting the amended Schedule B is not included in the filing (obviously inadvertently), but the only change made was to list an $18,000 fund on deposit in connection with New Mexico state court litigation with the Buna Jean Glenn Estate. (Fortunately the new local rules and required forms allow the reader to see immediately what the changes are without having to read through, or even have available, the amended schedule itself.)

On cross examination Debtor valued the cattle at $225,000 to $250,000, despite the facts that, for example, the Objection stated that the cattle were worth $100,000 (doc 64, at 3) and Schedule B/31 from the G13 case, filed January 11, 2010 (Ex. G), valued the herd at $125,000. This estimate of value is also quite at odds with the valuation contained in the Livestock Inspection Report of $93,250. Ex. F, Ex. 11. Debtor did not explain why a presumably experienced livestock inspector would value a herd at about 1/4 to 1/5 of its true value. Nor did Debtor explain how the cattle had a true value of between (4 or 5 x $93,250 =) $373,000 and $466,250 and yet were being valued by him at only $225,000 to $300,000.

**Analysis**

Debtor argues that even though the estate does not itself own the cattle, it does have a lien position on the cattle that constitutes property of the estate, and that the roundup orders being issued by the State District Court will cause the loss of the lien position, thus violating the automatic stay. The Court finds and concludes that the estate has no lien position of any sort in the cattle, and that even if it did have a lien position in the cattle which constituted an interest in property which would be lost if the roundup orders are enforced, the stay should

be modified pursuant to §362(d)(1) for cause, specifically lack of adequate protection.[12]

A. THE ESTATE DOES NOT HAVE A LIEN ON THE CATTLE

The New Mexico agistor's lien statute provides in part as follows:

> **§ 48-3-7. Liens for board, feed, shelter or pasture; priority**
>
> A. Innkeepers, livery stable keepers, lessors and agistors and those who board others for pay or furnish feed, shelter or pasture for the property and stock of others shall have a lien on the property and stock of such guest or guests and lessees or of those to whom feed or shelter has been furnished until the same is paid, and shall have the right to take and retain possession of such property and stock until the indebtedness is paid.
>
> B. It shall be unlawful for a lessee or owner to remove livestock from the leased premises, feedlot or pasture without the consent of the lessor feedlot operator or agistor unless the amount due for pasturage or feed be paid.
>
> C. The liens provided for in this section shall not take precedence over prior filed or recorded chattel mortgages, duly filed or recorded as provided by law, unless the holder of such mortgage shall expressly so consent in writing; provided that the giving of such written consent shall not affect the rights or priority under a prior mortgage as against a subsequent mortgage but the rights, liens and priorities of all such mortgages shall be and remain the same as if no such written consent had been given.

---

[12] In light of this conclusion, the Court need not decide whether a junior lien position held by an estate or a debtor implicates the automatic stay such that a senior foreclosing creditor must obtain stay relief to continue the foreclosure action.

Page 11 of 19

Case 10-11752-t12   Doc 81   Filed 11/01/10   Entered 11/01/10 16:13:31 Page 11 of 19

> D. An agistor shall retain his lien, notwithstanding
> the fact that he has relinquished possession of the
> livestock, if prior to relinquishment, he has filed for
> record with the clerk of the county in which the
> livestock are situate a statement declaring his intention to retain th
livestock on which the lien is claimed.
>
> E. For the purposes of this section, "agistor" means a
> person or entity whose primary business is to board,
> feed and care for livestock of others for a fee.

The most relevant part of the statute for purposes of this decision is subsection E. By its plain language, a necessary condition for obtaining an agistor's lien is that the person or entity must have as his or its "primary business" boarding, feeding and caring for livestock "of others for a fee". Debtor does not meet that standard.

The evidence is clear that for a quarter of a century Debtor has been engaged in cultivating a highly select herd of Black Angus cattle. He has done this for himself or, perhaps more technically, for one of the companies that he is president of, G13 Angus Ranch, Inc. And the work he has done – making sure the windmills are operating to keep the water tanks full, using the grass to best advantage to feed the cattle and maintain the grass, inseminating cattle and then deciding which calves to sell and which to keep, maintaining the brand (used in the current sense of that word as maintaining the good reputation of the product), watching for lightning and hoping for rain -- is indistinguishably either in his individual capacity or as

president of G13 Ranch, or for that matter as president of one of the other two corporations. The work and the expenditures have only the appearance of an agistor's business activities because while to a large extent they are the same activities that an agistor would engage in, Debtor did not perform these activities "for livestock of others for a fee"[13] as his "primary business".

Indeed, other than the care of this herd, there is no evidence that he ever performed any such services for any other person or entity.[14] Debtor mentioned no such services or clients in the course of his testimony at trial. The answer to question 1 of the Statement of Financial Affairs asking about income from "employment, trade, profession or operation of the debtor's business" shows $4,499 for each of calendar years 2009 and 2008, and nothing for 2010. Doc 11. The meagerness and uniformity of those amounts suggests no operations whatever conducted for

---

[13] The Court does not regard as a "fee" any salary Debtor received from one or more of the corporations for which he worked.

[14] Or even plans to in the future. The three sources of income listed in Exhibit A to the Amended Plan are "Sale – owned cattle, "Sale – leased cattle", and "Cattle show premiums". Similarly, the three sources of income listed in the Amended Plan's Exhibit E (labeled Greg Smith Plan Projections Based on Sale of Herd Secured by ABC Bank [sic]) are "Private land lease revenue", "Sale – leased cattle" and "Cattle show premiums". There is no mention of a continuing agistor's business. (Exhibits F and G to the Amended Plan are clearly only cattle and grazing leases respectively.) This serves as further evidence that the claim that Debtor engages in the business of caring and feeding cattle for others is the Debtor's remaining one-off shot at holding up the roundup of the cattle.

another's cattle.  And the quite unusual transfer of the other
corporations' land into the individual estate, which provided the
grass and water (and wide open spaces) for the cattle, does not
by itself make the Debtor an agistor, but rather only provides
the means to do so, had Debtor been in that business.  In short,
the record is completely devoid of any evidence that Debtor has
ever performed the role of an agistor as defined by the statute.
As the Bank accurately summarizes, "the Debtor is a cattle
breeder".

What all this means is that the estate may well have a claim
against G13 for the care and feeding of the cattle, but it has no
lien under the New Mexico agistor's lien statute.

Alternatively Debtor seems to suggest that the expenditure
of resources on the cattle entitles the estate to a lien on the
cattle on a quantum meruit theory, citing <u>Bird v. Thunder River
Const., Inc. (In re Smith)</u>, 2008 WL 2625231 (Bankr. D. Utah).
Objection, at 2-3.  <u>Thunder River</u> arose from a trustee's attempt
to collect a prepetition debt from two defendant companies with
whom the debtor had had an agreement, whereby the debtor, an
employee of one of the defendants, would use his own credit card
to purchase materials and services for construction projects that
the defendants were engaged in, with the understanding that the
defendants would reimburse the debtor for those charges.  The
defendants failed to reimburse the debtor for the charges, which

led debtor to file bankruptcy and the trustee to sue the defendants. The bankruptcy court ruled that the estate had a contract claim and a quantum meruit claim against both defendants for the unreimbursed expenses, and that these causes of action constituted property of the estate pursuant to §541(a)(1). <u>Id.</u>, at *2-4. That ruling by itself is unremarkable, and of course entirely consistent with the notion that the Smith chapter 12 estate owns a claim against G13 for the care of its cattle.[15] <u>Thunder River</u> says nothing about a lien position, much less anything to do with the automatic stay.[16] And in any event, New Mexico has provided a specific statutory remedy which addresses the issue of a lien and resource expenditures. That is the agistor's lien statute. No one has suggested why if the estate cannot fit its claim within that statute, the Court should permit the selection of an alternate theory which does not meet the statutory requirements.

---

[15] That claim against G13 could be for expenditures arising prior to the filing of this case in April 2010, as well as for postpetition expenditures. Partly in recognition of the ruling that any surcharge under §506(c) would be litigated later, the Bank agreed in closing argument that if necessary it would deposit the proceeds of the sale of the cattle into an account (presumably under the control of one court or the other).

[16] To be clear, although the context of the citation to <u>Thunder River</u> is an assertion of a lien position, a careful reading of the Objection discloses no statement by Debtor that a quantum meruit claim results in a lien.

In consequence of this conclusion, it is clear that Debtor has not met its underlying burden of demonstrating that it has a lien position on the cattle which implicates the automatic stay. See §362(g) (party opposing stay relief has the burden of proof on all issues other than debtor's equity in property).[17]

B.   THE STAY SHOULD BE MODIFIED FOR LACK OF ADEQUATE PROTECTION

Even assuming arguendo that the estate has a lien on the cattle and that the lien can serve as a basis for the assertion of the automatic stay, an issue the Court need not and does not decide[18], Debtor has failed to show that the Bank's interest in

---

[17] As a result, the Court need not decide whether the agistor's "lien is not an interest in a thing but only a right of detainer as security for payment of a debt." Bell v. Dennis, 43 N.M. 350, 354, 93 P.2d 1003, 1006 (1939). (Citation omitted.) See Butner v. U.S., 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.")

[18] Compare, for example, Fidelity Mortg. Investors v. Camelia Builders, Inc., 550 F.2d 47, 54 (2nd Cir. 1976), cert. denied 429 U.S. 1093, reh. denied 430 U.S. 976 (1977) ("FMI's interest under the deed of trust was a property interest for the purposes of the bankruptcy statutes and therefore conferred jurisdiction over the Jackson condominium project to the New York bankruptcy court.") (decided under former law) and Monumental Life Insurance Co. v. Bibo, Inc. (In re Bibo, Inc.), 200 B.R. 348, 352 (9th Cir. BAP 1996), appeal dismissed and opinion vacated for mootness In re Bibo, Inc., 139 F.3d 659 (9th Cir. 1998) ("Debtor's junior lien interest in the real property is property of the estate. This interest is protected by the automatic stay from foreclosure by a senior lienholder until such time as relief from the stay is granted, or the stay is no longer in effect.") with U.S. v. Whiting Pools, Inc., 462 U.S. 198, 204 n. 8 (1983):

(continued...)

Case 10-11752-t12   Doc 81   Filed 11/01/10   Entered 11/01/10 16:13:31 Page 16 of 19

the cattle is being adequately protected. The Court finds that, for purposes of the Motion, the cattle are worth $100,000, the land (including the value of the state land lease) is worth $627,500, and the personal property pledged to the Bank (and thus excluding the 2006 Eby 8' by 32' stock trailer pledged to the Bank of Clovis and listed in the schedules as worth $20,000) is worth $40,000. (This is likely a very optimistic estimate.) The total collateral value securing repayment of the $715,000 (measured as of April 8, 2010, the petition date) is therefore approximately $767,500. Debtor has not offered the Bank any other adequate protection, such as monthly cash payments (presumably because there is no capacity to do so[19]), so the proposed adequate protection must be the equity cushion in the Bank's collateral. Without taking into account any interest

---

[18](...continued)
The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title. See 124 Cong.Rec. 32399, 32417 (1978) (remarks of Rep. Edwards); id., at 33999, 34016-34017 (remarks of Sen. DeConcini); cf. § 541(d) (property in which debtor holds legal but not equitable title, such as a mortgage in which debtor retained legal title to service or to supervise servicing of mortgage, becomes part of estate only to extent of legal title);....

[19] Although the estate apparently has a claim against G13 for over $40,000, it has made no attempt to collect that sum from G13, as the Bank points out. Debtor controls G13, but the more important fact is that G13 does not have the wherewithal to pay any of that debt, leaving this estate unable to make any cash payments to the Bank.

accrual on the $715,000 since the filing almost seven months ago, and without allowing for the transaction costs of disposing of the livestock, real estate and equipment (anywhere from 5% to 10% at a minimum), the equity of ($767,500 - 715,000 =) $52,500 constitutes a cushion of just over 7%. By itself, 7%, in these circumstances, is totally inadequate. But then taking into account accruing interest and transaction costs of sales means that any equity cushion is in fact non-existent or negative. Not only has Debtor failed to meet its burden to prove the existence of adequate protection, as required by §362(g); at the end of the day the evidence is undeniable that the Bank's collateral position is underwater and deteriorating further. To the extent that the automatic stay is applicable in these circumstances, it must be modified.

**Conclusion and Order**

The foregoing discussion makes clear that the estate has no lien on the cattle, whether derived from the agistor's lien statute or any other source. Thus the automatic stay does not prevent the Bank from proceeding with the roundup actions. And even if the automatic stay were applicable, the estate's inability to provide adequate protection for the Bank's collateral position dictates that the stay would have to be modified.

For the reasons set forth,

IT IS THEREFORE ORDERED as follows:

1. The estate has no interest in the G13 cattle to which the provisions of §362 are applicable, so that the Bank may proceed with its roundup procedures, including but not limited to continuing the litigation in the 99th District Court of Lubbock County, Texas; and

2. Even if §362 were applicable, the automatic stay is modified to permit the Bank to proceed with its roundup procedures.

*/s/ James S. Starzynski*
James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket: November 1, 2010

COPY TO:

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

W J Wade, Jr
2112 Indiana Ave
Lubbock, TX 79410-1499

United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

Andrea D. Steiling
William F. Davis & Assoc., P.C.
6709 Academy NE, Suite A
Albuquerque, NM 87109